UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| WINSTON J. BALLEW, | Case No. 1:15-CV-00731-TSB |
| Plaintiff, | Judge Timothy S. Black |
| vs. | |
| ASBESTOS WORKERS LOCAL #8, RETIREMENT TRUST FUND, *et al.*, | |
| Defendants. | |

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (Doc. 10)**

This case arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*. ("ERISA"). Plaintiff Winston J. Ballew brings this action under 29 U.S.C. § 1132 against Defendants, the Asbestos Workers Local #8 Retirement Trust Fund and that fund's Board of Trustees, seeking to recover long-term disability (LTD) benefits under the terms of his employer-sponsored group benefits plan. The case is now before the Court on Defendants' motion for summary judgment (Doc. 10) and the parties' responsive memoranda (Docs. 12, 13).

**I.    BACKGROUND**

   **A.    Plaintiff's employment history**

Plaintiff began his employment with the Asbestos Workers Union #8 ("Local #8") on or around August 1985. (Doc. 12, at 2). His last day of work was January 7, 2012. (Doc. 10, at 8). At the time Plaintiff's employment with Local #8 ended, Plaintiff worked as a mechanic/insulator. (Doc. 12, at 2).

1

**B. The LTD plan**

By virtue of his employment with Local #8, Plaintiff was enrolled in the Asbestos Workers Local 8 Retirement Trust Fund (the Pension Fund), a multiemployer pension plan this was established by Local #8 in cooperation with an employer association of employers ("the Employer Association") signed to collective bargaining agreements with Local #8. (A.R. at 96). The primary purpose or the Pension Fund was to provide age-based pension benefits to the employees of various members of the Employer Association who were covered by collective bargaining agreements with Local #8. The Pension Fund also provides certain disability benefits to those employees. (A.R. at 98).

The Pension Fund is governed by a board of trustees ("Plan Trustees"). Two of the four Plan Trustees are appointed by Local #8 and the other two are appointed by the Employer Association. The Board of Trustees has established a plan of benefits which sets forth the eligibility requirements for age based and disability based pension benefits ("the Plan"). (*Id.* at 111). The Plan established a normal retirement benefit at age 65 as well as a variety of early retirement benefits. The Plan also provides for disability benefits for employees who meet certain eligibility requirements. The Trustees are given complete discretionary authority to determine eligibility requirements for benefits under the Plan.

Of particular importance to the adjudication of this motion to dismiss is Section 6.9 II (2) of the Plain, which states:

> A participant will be eligible for a reduced trade disability benefit from the
> plan only if all of the following conditions apply:
> . . .

2

2. The individual must have been an active participant in the plan within a 12 month period immediately prior to the onset of disability. For purposes of eligibility for a reduced trade disability benefit an individual is considered an active participant in the plan if employer contributions to the plan were made on the employee's behalf (or payments under a reciprocal agreement where applicable) for hours worked within a 12 month period immediately prior to the onset of disability.

(*Id.* at 141). Due to this provision, the parties' differing assertions regarding the onset date of Plaintiff's disability are determinative of whether Plaintiff can receive any LDT benefits under the Plan.

### C. Plaintiff's pre-application medical history

The administrative record submitted to the Court includes voluminous medical records from the Veteran's Administration ("VA"), where Plaintiff went to see his doctors and receive diagnoses/treatment. Plaintiff's medical records mainly cover the period from 2012, after he had ceased work, to the present. Although Plaintiff was examined by many medical professionals at the VA, his primary treating physicians appeared to be Dr. Claire Cunningham and Dr. James Plunkett. The following is a summation of the relevant examinations and treatments Plaintiff received related to his alleged disability due to back pain.

At the request of Dr. Cunningham, Plaintiff received a functional capacity evaluation administered by occupational therapist Jason Hayes on August 2, 2012. (A.R. at 75). The evaluation notes indicate that available imaging was "mostly unremarkable for anything other than mild multilevel degenerative changes" that were identified at vertebrae C5-C6. (*Id.* at 78). Plaintiff "seem[ed] to do well with many tasks during limited evaluation." (*Id.*). Specifically, Hayes noted that during Plaintiff's lifting test,

3

Plaintiff did not present an elevated heart rate that would be considered a "reliable indicator of subject effort." *Id.* The report concludes, "[Plaintiff] may not be able to continue to perform the work in his trade, but at the very least, should be able to tolerate sedentary tasks. Perhaps he could pursue disability through his union since this is his trade. Vocational rehabilitation may also be an option." (*Id.* at 78–79).

Dr. Cunningham then ordered an MRI on Plaintiff's lumbar spinal canal, which was conducted August 24, 2012. (*Id.* at 58). The MRI showed no significant bulging of herniated discs at the L3/4 level, mild diffuse disc bulge at the L4/5 level, and significant bulging or herniated discs at the l5/S1 level with no central spinal canal or foraminal stenosis. (*Id.* at 59). The impression from the MRI interpreter was that Plaintiff had "minimal degenerative disease" with "no definite evidence for metastatic tumor." (*Id.* at 60).

On January 11, 2013, Plaintiff received facet joint injections done at the L4-L5 and L5-S1 level. (*Id.* at 65). Plaintiff stated the injections gave him partial relief for one or two weeks, but that there was no functional improvement. (*Id.*).

On February 19, 2013, Plaintiff received a second functional capacity evaluation from occupational therapist James Bishop. (*Id.* at 65). Plaintiff endured several functional tests, including a sitting test, a gait test, and a lifting test. (*Id.* at 68). Mr. Bishop's report notes the lack of significant increase in heart rate during certain tests and concludes that it was "[d]ifficult to assess full functional capabilities as believe [Plaintiff] not giving full effort." (*Id.* at 68). The report states that "in summary, no significant change" was noted since Plaintiff's functional capacity evaluation on August 2, 2012.

Plaintiff returned to Dr. Plunkett on July 7, 2014 for a pain consult and to request a letter reflecting Dr. Plunkett's medical opinion regarding Plaintiff's disability. (*Id.* at 61). Dr. Plunkett's report indicates that various treatment options were discussed with Plaintiff during the consult. The report also states that "Mr. Winston Ballew has been disabled from prior employment as a Insulator/Pipe coverer since January 7, 2012 due to lumbar spondylosis and pain aggravated by motion, bending, lifting. He is likely permanently disabled from this employment based on his lumbar spinal condition." (*Id.* at 64). Plaintiff relies primarily upon this record as evidence in support of his asserted disability onset date of January 7, 2012.

Following the July 7, 2014 consult, Plaintiff had multiple appointments with Dr. Michael Clay, a chiropractor. Dr. Clay created a treatment plan for Plaintiff that included a home exercise program, modifications to Plaintiff's lifestyle, and outpatient treatment. (*Id.* at 85).

### D. Plaintiff's LTD application

Plaintiff initially filed for LTD benefits under the Plan on June 9, 2014. (*Id.* at 1). Attached to the initial application was a letter from Dr. Cunningham stating that Plaintiff suffered from hypertension, disability, and lower back pain. (*Id.* at 3). This one page letter stated that "[t]his back pain severely limits [Plaintiff's] abilities" but made no assertions regarding Plaintiff's disability status or Plaintiff's ability to perform the work of an insulator.

Plaintiff visited Dr. Plunkett on July 7, 2014, where he received the note, referenced above, indicating Dr. Plunkett's opinion that Plaintiff was disabled in a

5

manner that would permanently prevent his returning to the insulation industry and had been since January 7, 2012. Plaintiff forwarded this letter to the Plan Trustees for consideration. (*Id.* at 8).

On July 18, 2014, Plaintiff was informed by the Pension Fund that in connection with his disability benefit application he must be examined by an independent physician selected by the Pension Fund. (*Id.* at 9–10). Accordingly, Plaintiff was examined by Dr. Jose Luis Chavez on August 4, 2014. Dr. Chavez submitted a written medical opinion to the Pension Fund regarding his examination of Plaintiff and his findings. (*Id.* at 11–15). Dr. Chavez concluded that Plaintiff was totally and permanently disabled from work in the insulation trade, but unlike Dr. Plunkett, determined that the onset date of the trade disability was July 7, 2014. (*Id.* at 14).

On August 26, 2014, Plaintiff was notified by the Pension Fund administration that his application for disability benefits was being administratively denied on the basis that Dr. Chavez determined his onset date of disability to be July 7, 2014, which was more than 12 months since he last worked in covered employment (January 7, 2012). Plaintiff was advised of his appeal rights. (*Id.* at 16).

On October 31, 2014, Plaintiff, through legal counsel, filed a formal appeal to the Trustees from the administrative denial of his disability application. (*Id.* at 20). The basis for the appeal was that Plaintiff was totally and permanently disabled on January 7, 2012, the last date worked in covered employment and not on July 7, 2014, as found by the independent physician selected by the Pension Fund.

6

At their November 12, 2014 meeting, the Trustees reviewed the appeal filed by Plaintiff's legal counsel and denied the appeal. (*Id.* at 22). That same date, the Fund Administrator advised Plaintiff in writing of the Trustees' decision. (*Id.* at 23). The basis for the denial was that Plaintiff's onset of disability date was July 7, 2014, and therefore more than 12 months from his last date of covered employment in January, 2012. Plaintiff was advised that in making this decision the Trustees relied upon the medical report of Dr. Chavez.

On December 4, 2014, Plaintiff's counsel sent a written request for reconsideration of the Trustees' November 12, 2014, appeal denial. (*Id.* at 28). One of the bases for this request was that Plaintiff's counsel had only recently received a copy of the Dr. Chavez report, and that the failure to have this report at the time of the original appeal hampered his ability to effectively raise all issues on behalf of Plaintiff.

On December 16, 2014, the Fund's legal counsel sent a letter to Plaintiff's counsel stating that the Trustees' had approved his request for reconsideration. Plaintiff's counsel was advised that the matter would be considered at the next Trustees' meeting on February 25, 2015. (*Id.* at 31).

On December 22, 2014, Plaintiff's counsel sent a written request that he and Plaintiff be permitted to attend the February, 2015 Trustees meeting and personally address the Trustees. (*Id.* at 32). On December 31, 2014, the Fund's legal counsel advised Plaintiff's counsel that his request to attend the Trustee meeting had been granted by the Trustees (*Id.* at 33).

7

On February 25, 2015, Plaintiff and his legal counsel personally attended the Trustees' meeting and presented their arguments and position why Dr. Chavez's medical opinion regarding the onset of disability date was incorrect. Plaintiff also addressed the Trustees regarding his application and also answered various questions regarding his claim.

At this meeting, Plaintiff stated that he ceased work in January, 2012, because he was laid off for lack of work, and not because he was physically unable to perform the job duties. Plaintiff also stated that subsequent to January, 2012, he continued to seek employment in the insulation industry and that he had applied for employment in the industry with Vulcan, an employer in the industry. (*Id.* at 37, 45–50).

At the February 25, 2015 meeting the Trustees again denied the appeal of reconsideration (*Id.* at 34). On March 6, 2015, Plaintiff was notified by the Fund Administrator that his appeal had been denied (*Id.* at 36). The basis for the denial was the medical opinion of Dr. Chavez, as well as Plaintiff's statements at the February, 2015, appeal meeting that he left employment in January, 2012, due to lack of work not physical inability to perform; and also that subsequent to January, 2012, he continued to seek work in the insulation industry for a time.

## II.  STANDARD OF REVIEW

The Sixth Circuit has directed that claims regarding the denial of ERISA benefits are to be resolved using motions for judgment on the administrative record. *Wilkins v.*

*Baptist Healthcare System, Inc.,* 150 F.3d 609, 619 (6th Cir. 1998).[1] The district court is to conduct its review "based solely upon the administrative record." *Id. See also Zenadocchio v. BAE Sys. Unfunded Welfare Ben. Plan,* 936 F. Supp.2d 868, 872 (S.D. Ohio 2013).

There is no dispute that the Plan Trustees' decision to deny benefits in this case is subject to the arbitrary and capricious standard of review. Under the arbitrary and capricious standard of review, this Court must determine whether the Plan Trustees' decision to deny LTD benefits "is the result of a deliberate, principled reasoning process and . . . is supported by substantial evidence." *Glenn v. MetLife,* 461 F.3d 660, 666 (6th Cir. 2006) (quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds,* 929 F.2d 1140, 1144 (6th Cir. 1991)). Substantial evidence means "much more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Holler v. Hartford Life & Acc. Ins. Co.,* 737 F. Supp.2d 883, 891 (S.D. Ohio 2010) (citing *McDonald v. Western-Southern Life Ins. Co.,* 347 F.3d 161, 171 (6th Cir. 2003)). When it is possible to offer a "reasoned explanation" for the decision to deny benefits based on the evidence, the outcome is not arbitrary or capricious. *Cook v. Prudential Ins. Co. of Am.,* 494 F. App'x 599, 604 (6th Cir. 2012)

---

[1] In this case, the parties have diverted from the Court's traditional method of adjudicating ERISA claims by filing a "motion for summary judgment" as opposed to competing motions for judgment on the administrative record. However, having reviewed the motion for summary judgment, the parties' responsive filings to that motion, and the complete administrative record, the Court has determined that a conclusive ruling on Plaintiff's ERISA claim from the filings available is warranted.

(citing *Davis v. Kentucky Finance Cos. Retirement Plan,* 887 F.2d 689, 693 (6th Cir. 1996)).

The arbitrary and capricious standard of review is not a mere rubber stamp of the plan administrator's decision. *Kramer v. Paul Revere Life Ins. Co.,* 571 F.3d 499, 508 (6th Cir. 2009) (citing *Moon v. Unum Provident Corp.,* 405 F.3d 373, 379 (6th Cir. 2005)); *Jones v. Metro. Life Ins. Co.,* 385 F.3d 654, 661 (6th Cir. 2004) (citing *McDonald,* 347 F.3d at 172). As the Sixth Circuit in *McDonald* stated:

> [T]he district court had an obligation under ERISA to review the administrative record in order to determine whether the plan administrator acted arbitrarily and capriciously in making ERISA benefits determinations. This obligation inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues. Otherwise, courts would be rendered to nothing more than rubber stamps for any plan administrator's decision as long as the plan was able to find a single piece of evidence--no matter how obscure or untrustworthy--to support a denial of a claim for ERISA benefits.

347 F.3d at 172. "Deferential review is not no review, and deference need not be abject." *Id.* (internal quotation and citation omitted).

Plaintiff's response to the motion for summary judgment argues that the Court must consider Defendants' conflicts of interest when evaluating the Plan Trustees' denial of Plaintiff's LTD benefits application. A Defendant decision-maker, in determining whether benefits are to be paid, would have a natural reluctance to grant requests for benefits because those benefits would be paid out of the Defendant's own assets. *See Firestone Tire & Rubber Co.,* 489 U.S. at 115; *Metropolitan Life Ins. Co. v. Glenn,* 128 S. Ct. 2343, 171 L.Ed.2d 299 (June 19, 2008). Where the same entity "both funds and administers the plan ... it incurs a direct expense as a result of the allowance of benefits,

and it benefits directly from the denial or discontinuation of benefits." *Killian v. Healthsource Provident Administrators, Inc.,* 152 F.3d 514, 521 (6th Cir. 1998). This is "an actual, readily apparent conflict here, not a mere potential for one." *Darland v. Fortis Benefits Ins. Co.,* 317 F.3d 516, 527 (6th Cir. 2003)." The conflict of interest applies not only to the plan administrator itself, but also to those consultants and experts hired by the plan administrator. *Id.*

In this case, the Court does not see the potential for a conflict of interest in the assignment of disability benefits under the Plan. Here, an employers association and a union jointly select independent administrators to determine who is eligible for disability benefits to be paid by the Plan. The assets used to fund disability benefits are not the administrators' assets, and there is accordingly no financial incentive for the Plan Trustees to deny an individual's application. If the Plan Trustees in this case could be said to have a conflict of interest by virtue of the fact that they are partially selected by the body that pays the benefits, then the Court would have difficulty envisioning an arrangement where a payor could properly delegate administrative authority in a way that would cure such a conflict.

### III.  ANALYSIS

**A.  Defendants' decision regarding the onset date of Plaintiff's disability was neither arbitrary nor capricious**

The only dispute between the parties regarding Plaintiff's medical status is over the onset date of Plaintiff's disability. Plaintiff claims that he was disabled as of January 7, 2012, the last day of his employment with Local #8. Defendants claim that Plaintiff

11

was disabled as of July 7, 2014. Whether Plaintiff is eligible to receive LTD benefits under the terms of the Plan is dependent upon which of these dates is determined to be the actual onset date for Plaintiff's disability.

Plaintiff's assertion that he was disabled as of January 7, 2012 is based primarily on the conclusion of a treating physician at the VA, Dr. James M. Plunkett.[2] Dr. Plunkett examined Plaintiff on July 7, 2014, and filled out a one-page "work release statement" submitted by Plaintiff as part of his application for LTD benefits. (A.R. at 8). The statement contains the following comment:

> Mr. Winston Ballew has been disabled from prior employment as a Insulator/Pipe coverer since January 7, 2012 due to lumbar spondylosis and pain aggravated by motion, bending, lifting. He is likely permanently disabled from this employment based on his lumbar spinal condition.

(*Id.*).

The disability onset date relied upon by Defendants to deny Plaintiff LTD benefits comes from the August 4, 2014 examination and subsequent report of Dr. Jose Luis Chavez, the examining physician selected by the Plan Trustees. (*Id.* at 14). Dr. Lopez examined Plaintiff and determined that he was disabled, but after examining Plaintiff's medical records determined that the onset date of the disability was not until July 7, 2014, which was the date Dr. Plunkett examined Plaintiff and wrote the note supporting Plaintiff's disability claim. (*Id.*).

---

[2] Dr. Plunkett qualifies as a treating physician. Plaintiff's medical records from the VA show that he has seen Dr. Plunkett, along with other doctors, several times in the years leading up to this case. (A.R. at 57–95).

12

Plaintiff argues that the onset date chosen by Dr. Chavez was arbitrarily chosen as the date of the Dr. Plunkett appointment with no supporting evidence. Plaintiff claims that it is "illogical to think that a condition of disability has its onset on the date an individual is being seen for the condition." (Doc. 12, at 9). Plaintiff further argues that Dr. Chavez's report seems to be based upon Dr. Plunkett's analysis in all ways except, arbitrarily, the onset date:

> Dr. Chavez does completely rely upon Dr. Plunkett's medical review for the trade disability assessment and the debilitating conditions. (Exh. 5, Ad. R, p. 14). He continues that Dr. Plunkett had seen Mr. Ballew back in July, 2012 (*Id.*). He further agrees with all of Dr. Plunkett's opinions related to Mr. Ballew's disability, his inability to return to his former trade and the limitations. (*Id.*). The only assessment he does not completely ratify is the onset date. Rather, he slaps a consult date with Dr. Plunkett (July 7, 2014) as the onset date, thereby creating an arbitrary and capricious miscalculation of medical information detrimental to Plaintiffs trade disability application.

(*Id.* at 10).

An analysis of Dr. Chavez's opinion proves Plaintiff's claims to be without merit. Contrary to Plaintiff's allegations, Dr. Chavez did not solely rely upon Dr. Plunkett's July 7, 2014 consult notes in determining that Plaintiff was disabled. Dr. Chavez's opinion contains a thorough discussion of Plaintiff's entire relevant medical history, including his August 2012 MRI showing limited degeneration, his November 2012 EMG indicating normal nerve conduction in his right leg, and his February 2013 functional capacity evaluation in which the examiner stated the belief that Plaintiff was not giving his full effort on the physical tests. (*Id.* at 13-14). It was reasonable for Dr. Chavez to look at these objective examinations and conclude that at the time they were made, Plaintiff was

capable of continuing work in the insulation industry. It is no surprise that Dr. Chavez and Dr. Plunkett have no disagreement as to Plaintiff's current disabled status—both doctors could make a determination of current status based on a personal examination. However, Plaintiff's claim that Dr. Chavez's analysis of Plaintiff's *historical* health was based only on one report of Dr. Plunkett and was not supported by any evidence is wrong, as demonstrated in Dr. Chavez's report.

Plaintiff may believe that Dr. Chavez's opinion about Plaintiff's onset date is not correct, and that Mr. Plunkett's divergent opinion is. Dr. Chavez's opinion was not, however, arbitrary. Accordingly, it was appropriate for the Plan Trustees to rely on that opinion when determining the onset date of Plaintiff's disability.

The Plan Trustees' findings regarding the onset date of Plaintiff's disability are also supported by Plaintiff's own statements made before the Trustees. The Plan Trustees agreed to reconsider their denial of Plaintiff's LTD benefits appeal at a Trustee meeting on February 25, 2015. At that meeting, Plaintiff stated that the reason he stopped working January 7, 2012 was because he had been laid off for lack of work, and not as a result of being unable to work due to disability. (*Id.* at 37). Plaintiff further supported this assertion by divulging that, following being laid off, he continued to seek employment in the insulation industry. (*Id.*).

Plaintiff argues that he not a medical professional, and so his statements should not be taken into consideration by this Court in determining whether Defendants' rejection of Plaintiff's alleged onset date was arbitrary or capricious. (Doc. 12, at 12). However, Plaintiff's statements quite obviously grant insight into whether Plaintiff was

14

able to work on January 7, 2012. By acknowledging that his last day of work was not related to injury, Plaintiff supports Defendants' determination that he was not disabled at that time. Defendants' reliance upon Plaintiff's admission that his termination was for reasons unrelated to disability was neither arbitrary nor capricious.

Accordingly, the Plan Trustees' determination that Plaintiff was not eligible for LTD benefits under the terms of the Plan was neither arbitrary nor capricious.

**B.  Plaintiff's admission that he continued to seek work in the insulation industry subsequent to January 7, 2012 precludes him from collecting disability payments under the Plan.**

In addition to defending the Fund Administrator's conclusion regarding Plaintiff's disability onset date, Defendants also argue that there were other reasons independent of the disability onset date for denying Plaintiff's application for LTD.

Article 6.9(II) of the Plan provides as part of the eligibility requirements for the trade disability benefit as follows:

> *4. The individual has totally abandoned the insulation industry as a source of income. It the express intention of the plan to exclude from eligibility for disability benefits those Participants who, although otherwise meeting the definition of disability at the trade contained in this Article, remain in the insulation industry in any capacity, included but not limited to owners, managers, management employees, supervisors, foremen, consultants, journeymen and full-time paid labor union officials.*

(A.R. at 146).

As part of his appeal process, Plaintiff attended a hearing before the Plan Trustees on November 25, 2015. At that hearing, Plaintiff stated that he had been laid off from Local #8 on January 7, 2012 due to lack of work, and not as a result of his disability.

15

(A.R. at 37). Plaintiff further stated that after he was laid off on January 7, 2012, he continued to search for employment within the industry, including specifically at an industry employer named Vulcan, but was not hired. (*Id.*).

Defendants contend that Plaintiff's admission that he did not totally abandon the insulation industry after January 7, 2012 serves to disqualify him from receiving trade disability benefits under the Plan due to Article 6.9(II), cited above. The plain text of the eligibility requirements for the Plan supports Defendants' contention. An individual who is actively searching for employment within the insulation industry cannot be said to have totally abandoned the industry as a source of employment.

Plaintiff does not dispute the record of his statements at the November 25, 2015 hearing. However, he argues that the Court should not consider the statements to be an accurate reflection of Plaintiff's circumstances following the end of his employment with Local #8. In a letter written after the hearing, Plaintiff's counsel suggests that his client was "duped" into making statements that gave the Plain Trustees license to deny LTD benefits. (A.R. at 47). The Court does not agree. Plaintiff's statement regarding his continued search for employment was not merely an off the cuff remark that could be easily misconstrued. Plaintiff stated not only that he was still searching for work but also who specifically he tried to work for. This is not a harmless slip of the tongue; it is an admission that Plaintiff was not eligible for LTD benefits under the Plan.

Accordingly, Plaintiff's admission that he had not ceased efforts to gain employment in the insulation industry as of January 7, 2012 serves as an independent basis for which LTD benefits under the Plan were rightly denied.

16

**C.    Plaintiff's election to take early retirement is an independent basis for denying disability benefits under the Plan.**

Defendant's motion for summary judgment also argues that Plaintiff became ineligible for LTD benefits under the Plan because he applied for and received an early retirement benefit under the Pension Fund in March, 2015, eight months prior to commencing this suit. (Doc. 10, at 17–18). Article 5.8(b) of the Plan specifically states that "[a]ny participant who has applied for and received an early retirement benefit, shall not be entitled to a disability benefit under this Plan." (A.R. at 139). This exclusion is emphasized in the "Asbestos Workers Local #8 Retirement Trist Fund Summary Plan Description" provided to employees. (A.R. at 288). Plaintiff also received a letter specifically warning that taking early retirement would preclude collecting LTD benefits in August 2014, before he applied for his early retirement benefit. (A.R. at 16).

Plaintiff argues that the early retirement exclusion is inapplicable here: "It is obvious that this provision is included to stop "double-dipping" or disability filings after an early retirement has been filed. There is scant documentation that a forced filing after exhaustion of administrative process for the trade disability closes the issue." (Doc. 12, at 12). Plaintiff, however, cites no precedent that would enable the Court to ignore both the clear language of the Plan and the fact that Plaintiff was made aware of the consequences of taking early retirement before electing to do so.

Accordingly, Plaintiff's election to receive early retirement benefits made him ineligible to receive LTD benefits under the Plan.

## IV. CONCLUSION

Accordingly, for the reasons stated above, Defendants' motion for summary judgment (Doc. 10) is **GRANTED**. Plaintiff's complaint (Doc. 1) is **DISMISSED WITH PREJUDICE**. The Clerk shall enter judgment accordingly, whereupon this case shall be **TERMINATED** from the docket of this Court.

**IT IS SO ORDERED.**

Date: 6/5/17

*Timothy S. Black*
Timothy S. Black
United States District Judge